# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In re the Welfare of R.R.G.,<br>D.O.B. 05/12/15,<br>a minor child, | DIVISION ONE<br><br>No. 77650-9-I<br><br>UNPUBLISHED OPINION |
| STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>　　　　　　　Respondent,<br><br>　　　v.<br><br>G.E.R., II,<br><br>　　　　　　　Appellant. | FILED: November 5, 2018 |

DWYER, J. — G.E.R., II appeals the termination of his parental rights to his daughter R.R.G. He contends the Department of Social and Health Services (Department) failed to carry its burden under RCW 13.34.180(1)(d) of proving it offered or provided all necessary services, reasonably available, capable of correcting his parental deficiencies within the foreseeable future. We affirm.

I

G.E.R., II (G.E.R.), is the biological father of a girl, R.R.G., born May 12, 2015. R.R.G.'s mother, S.R.G., voluntarily relinquished her parental rights and is not a party to this appeal.[1]

In July 2015, the Department filed a dependency petition for R.R.G. alleging there was no parent or guardian adequately capable of caring for her. The petition recited concerns about the parents' substance abuse, lack of adequate child supervision, and domestic violence. The petition noted prior referrals for both parents, including five for G.E.R. based on his substance abuse, domestic violence, and criminal activity while he had custody of the couples' son. It also noted G.E.R.'s extensive criminal history, including domestic violence assaults and violations of domestic violence protection orders. The petition stated that G.E.R. was currently homeless but made no mention of mental health concerns.

In October 2015, the court entered an agreed dependency order as to G.E.R. and ordered the following services: a psychological evaluation with parenting component; a substance abuse evaluation; random urinalysis (UAs); domestic violence batterer's assessment/anger management assessment; and age-appropriate parenting instruction. The order required G.E.R. to "[c]ontact the Department to request a referral" for the psychological evaluation, to maintain safe, stable, and sober housing suitable for the care of the child, and to maintain

---

[1] G.E.R. and S.R.G. also have a son who was placed in a guardianship and is not a party to this appeal.

at least monthly contact with the social worker and GAL. The court also ordered a minimum of two supervised visits per week with R.R.G.

One year later, following a dependency review hearing, the court found that despite a May 2016 referral for a psychological evaluation, G.E.R. had not scheduled the evaluation. Although he completed parenting instruction and in-patient treatment, he failed to complete UA testing, provide proof of attendance at sober support meetings, or complete a DV or anger management assessment. He also failed to obtain safe, sober, and stable housing.

In November 2016, the Department filed a petition to terminate G.E.R.'s parental rights to R.R.G. The Department alleged it offered or provided G.E.R. a "substance abuse evaluation, random urinalysis, domestic violence batterer's assessment, and age-appropriate parenting instruction." The Department also provided "case management services," including "providing and facilitating implementation of services as available." The petition concluded:

> 12. Over 16 months of services during this dependency have failed to produce any significant increase in parenting ability and no significant progress has been achieved during dependency towards being able to appropriately return the child to the home of the . . . father on a full-time basis.
>
> . . . .
>
> 17. The mother and father are currently not fit to parent the child. The Department has identified the following parental deficiencies that have not been corrected and necessitate termination of parental rights: . . . The father's chemical dependency, **mental health**, and domestic violence issues render him incapable to safely parent the child or meet the child's emotional, developmental, and physical needs.

(Emphasis added.)

In a request for admissions, G.E.R. admitted he had "not requested any additional services that have not been previously offered that would remedy [his] parental deficiencies."

On October 4, 2017, the court held a termination hearing. R.R.G.'s mother voluntarily relinquished her parental rights. G.E.R. contested the termination of his parental rights.

Department social worker Christy Davis-Ludy testified that she filed the dependency petitions for R.R.G.'s parents. During her investigation, she learned that G.E.R. was living in a car with his mother outside her home. Although his mother owned the home, she was renting it out. Davis-Ludy also learned that G.E.R. had a history of substance abuse and domestic violence.

Roxanna Valdovinos, the social worker assigned to R.R.G. for most of the dependency, did not testify.

Social worker Kayla Allen testified that she took over R.R.G.'s case in July 2017 and reviewed the entire file. She testified that Valdovinos, herself, and others in the Department offered or provided G.E.R. all court-ordered services and made him aware of each of those services. According to Allen, G.E.R. failed to follow through with four separate appointments for a domestic violence assessment. When Allen called the assessment provider shortly before trial, they indicated G.E.R. could no longer receive their services "due to his three no shows."

Allen testified that G.E.R. did not participate in scheduled visits or UAs arranged by the Department. She acknowledged that the UA appointments were

in Mount Vernon, not in Anacortes where G.E.R. lived, and visitation was 30 to 60 minutes away. She testified that she spoke to G.E.R. about bus passes, but he said he would get back to her about that. She testified she would have provided bus passes if G.E.R. had gotten back to her. When asked if she saw anything in the file indicating why G.E.R. did not participate in UAs, Allen stated that "he just declined on multiple occasions to participate" and "cited such things as his religion," not bus passes or transportation.

According to Allen, G.E.R. completed inpatient treatment for substance abuse but did not engage in the recommended follow-up outpatient treatment despite a scheduled appointment. Allen testified that G.E.R. did complete his psychological evaluation, however, and participated in a parenting class. Allen could not think of any additional services that would have corrected G.E.R.'s parental deficiencies.

Allen testified it was her understanding that the Department had communicated with G.E.R. regarding the fact that he was on the Anacortes Housing Authority wait list, and that he had been on it throughout the dependency. She conceded that other housing options existed in Mount Vernon and Snohomish County and that the Department had not referred G.E.R. to those services.

In Allen's opinion, R.R.G. could not be returned to G.E.R. in the near future. She testified that continuing their parent/child relationship would be detrimental to and unsafe for R.R.G. and "would delay permanency for her . . . in her current home." Allen believed it was in R.R.G.'s best interest "to remain in

5

her current placement . . . . That is where she has been for most of her life, most of the two years that she has been in this world."

Alicia Azurin, a Department home study licensor, performed a home study of G.E.R.'s mother's residence. Azurin reviewed police records indicating that G.E.R. had assaulted his mother in 2014 and 2016. Azurin did not know whether the police reports resulted in prosecutions. She also testified, however, that G.E.R.'s mother told her G.E.R. "had punched [her] . . . in her chest" and had "mental health issues" because he thought he was hitting somebody else.

Amy Petersen, a chemical dependency professional, testified that she did a chemical dependency assessment of G.E.R. in early 2016. She noted that G.E.R. had been treated as an outpatient at a substance abuse facility in 2011, but quit attending shortly after signing a 100 percent compliance contract. Petersen concluded he had symptoms of substance abuse disorder and recommended outpatient treatment, random urinalysis, and a minimum of two sobriety-based self-help groups per week.

Evonne Prouty, a chemical dependency trainer, testified that G.E.R. successfully completed 60 days of inpatient substance abuse treatment at Pioneer North Center (PNC) in 2016. Prouty testified PNC was "co-occurring capable," meaning patients with existing mental health diagnoses could see a psychiatrist and continue medications during treatment. Prouty did not think G.E.R. received services from a psychiatrist at PNC, but had group counseling, process groups, and grief and loss classes. At the end of G.E.R.'s inpatient treatment, Prouty recommended he receive intensive outpatient aftercare.

6

Carroll Hundahl testified that she owns Phoenix Recovery Services in Mount Vernon. Hundahl testified that G.E.R. failed to appear for approximately 40 UAs between 2015 and 2017.

Dr. Christopher Tobey, a licensed psychologist, testified he performed a psychological evaluation of G.E.R. in March 2017. Dr. Tobey administered a two-hour psycho-social interview, which included a "mental status exam," and a personality assessment inventory comprised of 344 questions. He also completed a parent/child observation and interviewed collateral witnesses. G.E.R. told Dr. Tobey he had 40 arrests for domestic violence. His test results revealed hostility, bitterness, poor control over anger, drug abuse or dependence, and inflated self-esteem. G.E.R. showed interest in, and a bond with, his son. But he "was not as interested in" and did "not have much of a bond with" R.R.G.

Dr. Tobey concluded that G.E.R. "has a significant history of chemical dependency and alcohol abuse, homelessness and instability in his life. There is a long history of self-reported domestic violence with . . . nearly 40 arrests." Dr. Tobey recommended G.E.R. participate more in aftercare such as AA, complete a domestic violence evaluation, and find stable housing.

Amy Wharton, R.R.G.'s Guardian Ad Litem (GAL), testified that R.R.G. had lived 95 percent of her life in her foster home and was doing "very well" there. G.E.R. visited his daughter only once during the dependency. The foster parents, on the other hand, wanted to adopt R.R.G. Wharton concluded that

termination of G.E.R.'s parental rights and adoption by the foster family were in R.R.G.'s best interests.

Wharton noted she had trouble communicating with the previously assigned social worker, Roxanna Valdovinos, because Valdovinos was not keeping her "in the loop as to what has been going on within the cases." Wharton was, however, usually able to get an answer from Valdovinos's supervisor.

G.E.R. testified that the Department failed to provide timely responses, information needed to complete services, and a referral for mental health services. He said, however, that he received a letter informing him of "the location . . . that I needed to get an anger management assessment, mental health evaluation, take random UA's, so on and so forth." G.E.R. stated that during the dependency he was "pretty much parked outside my mom's house or parked down the street from my mom's house."

The trial court granted the termination petition and entered the following pertinent findings and conclusions:

> 2.11 Since dependency was established, services ordered under RCW 13.34.130 have been offered or provided and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided. These services included the following as to the father: substance abuse evaluation, random urinalysis, domestic violence batterer's assessment, and age-appropriate parenting instruction. In addition, the following services were provided: case management services, monitoring parents' compliance. Despite the offering of these services, there has been little improvement in parental functioning.

> **2.11.1 The court indicated that although the father did not engage in all offered services, the father did engage in some services that were offered, including parenting classes, and in-patient substance abuse treatment at Pioneer Center Northwest. The father did not engage in any recommended outpatient services after completion of in-patient treatment.**

2.12 Given the 24 months of services offered or provided, there is little likelihood that the conditions will be remedied so that the child could be returned to the father in the near future.

> **2.12.1 The Court finds the father has not corrected his parental deficiencies with regard to the child and further that the father is not likely to correct the deficiencies in the foreseeable future. The court accepts the opinion expressed by the GAL that there is little likelihood that the conditions will be remedied such that the child can be returned to the care of Mr. Rucker in the near future.**

2.13 Continuation of the parent-child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home. The consensus of expert opinion is that both the likelihood and the ease with which a child will bond into a new family setting are increased when the child is placed into a family setting at a younger age versus a more delayed placement. The continuation of the status quo is not in the child's best interests and a resolution is needed as to who will be this child's permanent caretaker. The child's needs for permanence and stability must, at this point in time, be accorded priority over the rights of the biological parents in order to foster the early integration of the child into a stable and permanent home as quickly as possible.

2.14 Termination of the parent-child relationship is in the best interests of the child to allow adoption planning to begin and to foster the creation of a stable and permanent placement for the child.

2.15 The parents are currently unfit to parent the child. The Department has identified the following parental deficiencies that have not been corrected and necessitate termination of parental rights: the father's chemical dependency, **mental health,**[2] and

---

[2] (Emphasis added.)

9

domestic violence issues render him incapable to safely parent the child or meet the child's emotional, developmental, and physical needs.

> **2.15.1 The Court finds the father has not corrected his parental deficiencies with regard to the child.**

. . .

### III. Conclusions of Law

. . .

3.3 The requirements of RCW 13.34.180(a) - (f) and RCW 13.34.190(2) have been established by clear, cogent, and convincing evidence.

3.4 The parent-child relationship existing between [R.R.G.], and her father, [G.E.R.], should be terminated pursuant to RCW 13.34.190 (1)(a) and (2).[3]

G.E.R. appeals.

II

Parental rights are a fundamental liberty interest protected by the United States Constitution. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence[4]:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

---

[3] Trial court's emphasis except where noted.
[4] "Clear, cogent, and convincing" means highly probable. <u>In re Welfare of M.R.H.</u>, 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . ; and

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b).

On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Dependency of A.M., 106 Wn. App. 123, 131, 22 P.3d 828 (2001). Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Consequently, we defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. A.V.D., 62 Wn. App. at 568; In re Welfare of S.J., 162 Wn. App. 873,

881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

### III

G.E.R. contends the Department failed to carry its burden under RCW 13.34.180(1)(d) of proving it offered or provided all necessary services, reasonably available, capable of correcting his parental deficiencies within the foreseeable future. He advances several supporting arguments, which we address in turn.

### A

G.E.R. contends the Department failed to satisfy RCW 13.34.180(1)(d) because it failed to adequately investigate or provide mental health services. He acknowledges that such services were not court-ordered. He argues, however, that they were "necessary services" within the meaning of RCW 13.34.180(1)(d) because the Department knew he had mental health issues. The record supports the court's finding that the Department provided all necessary services.

We note initially that neither the dependency petition nor the agreed order of dependency mentioned concerns for G.E.R.'s mental health, and that mental health services were not court-ordered. Several visitation referrals by social worker Roxanna Valdovinos stated, however, that visitation was supervised, in part, because the "[f]ather has mental health issues." Valdovinos also stated in an early referral for a domestic violence assessment that the "[f]ather has a long history of mental illness and substance abuse." The record contains no factual basis for these references. In any case, the record demonstrates that the

Department endeavored to determine G.E.R.'s mental health status, that various assessments during the dependency raised no concerns, and that G.E.R. did receive some mental health services during his inpatient substance abuse treatment.

The October 2015 dependency order required G.E.R. to complete a psychological evaluation with a parenting component. Although the Department made referrals for the evaluation in May and September of 2016, G.E.R. did not schedule an appointment until March 2017.

Meanwhile, in January 2016, G.E.R. underwent a substance abuse assessment at Phoenix Recovery Services, LLC. The assessment included psychometric testing, clinical observation, and a personal interview. The assessment summary stated that G.E.R.'s mental health "appeared to be stable." In the category of "Emotional, Behavioral, or Cognitive Conditions and Complications," the assessment stated, "No services are needed."

A September 2016 home study report noted that G.E.R. "recently completed inpatient treatment at Pioneer Center North **for mental illness** and substance abuse and is assigned to an aftercare program." (Emphasis added.) PCN employee Evonne Prouty testified that PCN was equipped to handle co-occurring substance abuse and mental health disorders and that G.E.R. successfully completed the inpatient program.

In March, 2017, Psychologist Christopher Tobey performed the court-ordered psychological evaluation. It included psychological testing, a two-hour psycho-social interview, and an assessment of G.E.R.'s mental health status.

The evaluation report states that G.E.R. "was able to make simple and complex change" during the interview and that "[h]is general fund of information" and short-term memory were "intact." G.E.R. "demonstrated both concrete and abstract thinking" and denied any prior mental health issues or treatment. His responses to testing indicated that he "attend[ed] to item content properly." Dr. Tobey's report identified substance abuse and domestic violence treatment as priorities but made no recommendation regarding mental health services.

When asked at trial whether he recommended any mental health treatment following his evaluation, Dr. Tobey said, "Not at that time." He explained that he "wanted to make sure that [G.E.R.] was stable with substance abuse, had a DV evaluation, and then determine whether or not there were ongoing various [mental health] issues that needed to be addressed." Significantly, Dr. Tobey recommended unsupervised visitation once G.E.R. was engaged in substance abuse aftercare and had a domestic violence assessment.

Finally, social worker Allen testified that while she could not recall the date of the referral, the Department did refer G.E.R. for mental health services at Catholic Community Services (CCS).

Thus, the Department attempted to determine G.E.R.'s mental health status early on by ordering a psychological evaluation, but G.E.R. did not follow through with the evaluation until late in the dependency. Still, G.E.R.'s mental health was assessed at several points during the dependency, and none of these assessments resulted in any concerns or treatment recommendations. The Department nevertheless referred G.E.R. to CCS for mental health services, and

14

he received some mental health services during his substance abuse treatment at PCN. In sum, the record does not support G.E.R.'s claims that the Department failed to adequately investigate or address his mental health and that additional mental health services were necessary under RCW 13.34.180(1)(d).

Citing S.J., 162 Wn. App. 873, and In re Parental Rights of I.M.-M., 196 Wn. App. 914, 385 P.3d 268 (2016), G.E.R. also claims the Department was required to provide him integrated mental health and substance abuse services. But as discussed above, G.E.R.'s mental health assessments during the dependency were unremarkable and, in any event, G.E.R. received concurrent mental health and substance abuse treatment at PNC.

In addition, S.J. and I.M.-M. are distinguishable. In S.J., the dispositional order stated that mental health services would be provided *only* after the mother achieved sobriety. After three failed attempts to complete inpatient drug treatment, the mother succeeded soon after receiving mental health services. On appeal, the mother argued that "coexistent mental health services were necessary for successful early treatment." S.J., 162 Wn. App. at 882. The S.J. court determined the mother's initial inability to complete inpatient treatment was linked to her mental health issues. S.J., 162 Wn. App. at 882. Citing a legislative finding that integrated treatment of co-occurring disorders is often critical to successful outcomes, the court concluded the Department failed to timely offer or provide all necessary services because it did not offer concurrent mental health and substance abuse treatment for her co-occurring disorders.

15

Here, neither the dispositional order nor the Department required sequential substance abuse and mental health treatment. Rather, the court attempted to obtain substance abuse and psychological evaluations simultaneously. In addition, unlike G.E.R., the parent in S.J. fully engaged in services but was hampered in inpatient treatment by the lack of concurrent mental health treatment. G.E.R. did not fully engage in services. He visited R.R.G. just once during the entire dependency, never obtained a domestic violence evaluation, and no-showed for 40 UAs. And unlike the mother in S.J., G.E.R. successfully completed inpatient treatment and then simply chose not to participate in outpatient treatment.

In I.M.-M, the mother promptly completed a court-ordered psychological evaluation that showed she had significant cognitive impairment impacting her ability to succeed in services. The Department, however, never timely provided the evaluation to service providers or tailored services to the mother's needs. The I.M.-M. court noted that the "dependency orders required a mental health evaluation" and that "[t]he only possible basis for this requirement was the reference in the dependency petition to [the parent's] cognitive impairment. No other mental health concerns were documented." I.M.-M., 196 Wn. App. at 923. In this case, the dependency petition, dependency order, and assessments during the dependency made no mention of mental health issues or cognitive impairment. And in contrast to the record here, the record in I.M.-M. demonstrated that additional services would not be futile. Unlike G.E.R., the parent in I.M.-M. *promptly* obtained a mental health evaluation and other

assessments, regularly participated in visitation, and despite being homeless, kept in touch with social workers.

B

G.E.R. next contends the Department "failed to provide any housing services, despite identifying a lack of stable housing as a parental deficiency." Although housing assistance, like mental health treatment, was not a court ordered service, G.E.R. claims he was entitled to it under the portion of RCW 13.34.180(1)(d) requiring all "necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."

The record, however, establishes that G.E.R. received housing assistance and that additional assistance would have been futile. Substantial evidence at trial showed that G.E.R was on the Anacortes Housing Authority wait list "throughout the dependency."[5] Significantly, G.E.R. never requested additional housing assistance despite the fact that his agreed dependency order made it his responsibility to maintain safe, stable, and sober housing suitable for the care of the child.

In any event, "'[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'" In re Parental Rights to K.M.M., 186 Wn.2d 466, 483, 379 P.3d 75 (2016) (internal quotation marks omitted) (quoting In re Welfare of

---

[5] Whether G.E.R. accomplished this himself or through the Department is immaterial. A court may consider any service received, from whatever source, in determining whether services have been provided. In re Dependency of D.A., 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004).

C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)) (quoting In re Welfare of M.R.H. and J.D.F., 145 Wn. App. 10, 25, 188 P.3d 510 (2008)). It is well-settled that "[w]hen a parent is unwilling or unable to make use of the services provided, [the Department] is not required to offer still other services that might have been helpful." In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001); In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005). Even when the Department "inexcusably fails" to offer or provide necessary services, "termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future." T.R., 108 Wn. App. at 164; see also In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

Despite two years of dependency proceedings, G.E.R. failed to complete court-ordered services for domestic violence, substance abuse, and urinalysis. Dr. Tobey testified that while G.E.R. was bonded with, and interested in, his son, he was not bonded with R.R.G. and showed little interest in her. In these circumstances, additional housing assistance would have been futile and would not have remedied G.E.R.'s parental deficiencies within the foreseeable future.

C

G.E.R. claims the Department failed to establish "that [its] social worker(s) provided reasonably competent case management throughout the dependency." But neither RCW 13.34.180(1)(d) nor the cases cited by G.E.R. place such an affirmative burden on the Department. The cases merely stand for the proposition that where a dependency service would not be futile, delays or omissions in providing the service may undermine a finding that all necessary

services were offered or provided as required by RCW 13.34.180(1)(d).[6] Accordingly, we review G.E.R.'s claims of caseworker incompetence in the context of his challenges, discussed above, to the services required under RCW 13.34.180(1)(d). We conclude the claims are either unsupported by the record, or do not undermine the court's findings and conclusions regarding the Department's satisfaction of RCW 13.34.180(1)(d).

Relying heavily on his own testimony, G.E.R. argues that "[t]he Department failed to communicate timely and effectively with both G.E.R. . . . and various service providers" and that these omissions fatally undermine the court's findings regarding services, particularly housing and mental health services, under RCW 13.34.180(1)(d). We disagree for several reasons.

First, the credibility, weight, and persuasiveness of G.E.R.'s testimony were matters for the trial court and are beyond the scope of our review. Camarillo, 115 Wn.2d at 71.

Second, substantial evidence in the record shows that the Department maintained adequate communication with G.E.R. and his service providers. Christie Davis-Ludy testified that, prior to the filing of the dependency petition,

---

[6] S.J., 162 Wn. App. at 881-84 (reversing termination due to Department's failure to timely provide court-ordered mental health service that might have helped the parent progress in other services at an earlier stage and would not have been futile); In re Dependency of T.L.G., 126 Wn. App. 181, 198-203, 108 P.3d 156 (2005) (where "protracted delay" in obtaining psychological evaluations was not "solely (or even mostly)" caused by the parents, there was no reason why mental health services could not be provided pending the evaluations, and there was no finding parents could not have benefitted from the services, the delay and "false premise that all other services should await the [evaluation] results" fatally undermined the court's finding that necessary services were offered); In re Dependency of H.W., 92 Wn. App. 420, 426-30, 961 P.2d 963, 969 P.2d 1082 (1998) (termination was premature where Department did not offer parent disability services and record did not support finding of futility).

she contacted G.E.R. and talked to him about a chemical dependency assessment, parenting instruction, and "maybe mental health." The agreed dependency order corroborated Davis-Ludy's testimony, stating that "DSHS made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home." Davis-Ludy further testified that she continued to follow up with the family after the dependency petitions were filed.

Social worker Valdovinos made multiple service referrals for G.E.R., including several for a domestic violence assessment and another for a substance abuse assessment. It is undisputed that she sent service letters to G.E.R.'s mailing address that listed the services he needed to complete and the names and phone numbers of the service providers. Two letters in the record informed G.E.R. that the Department was not sure where he was currently living, and that he needed to maintain a safe and sober home. G.E.R. admitted receiving "a thing in the mail" that reminded him "to get an anger management assessment, mental health evaluation, take random UA's, so on and so forth." He conceded he had "just been standing by for these services to come around."

Social worker Allen testified that G.E.R. was "made aware of the services that he was being referred [for.]" She testified, and several exhibits corroborated, that the Department repeatedly referred G.E.R. for a domestic violence assessment. The Department alleges, and G.E.R. does not dispute, that "[t]he fact that [G.E.R.] failed to appear for scheduled appointments means that he knew of the referrals and did schedule them." Allen testified that the Department set up eight visits for G.E.R. with R.R.G. Allen also testified that while G.E.R. did

20

not currently have a phone, they still communicated through his father's or mother's phone.

Amy Petersen testified, and Exhibit 10 confirmed, that social worker Valdovinos referred G.E.R. to Phoenix Recovery for a substance abuse assessment and that she spoke with Valdovinos by phone.

The record also belies G.E.R.'s specific complaints about the Department's communication with the GAL, PNC, and Dr. Tobey. While the GAL mentioned some difficulty communicating with social worker Valdovinos, she conceded she was usually able to get answers from Valdovinos' supervisor. G.E.R.'s allegation that the Department did not communicate with substance abuse treatment provider PNC is not supported by references to evidence in the record. While G.E.R. points out that PNC employee Evonne Prouty could not recall any specific contact with anyone at the Department, Prouty remembered communicating with someone to set up visitation and could not rule out that it was someone with the Department.

As for the Department's communication with Dr. Tobey, G.E.R. alleges, but fails to demonstrate, that the Department's referral letter to Dr. Tobey was unclear or failed to request an evaluation of his mental health. And even if, as G.E.R. alleges, Dr. Tobey misinterpreted the referral, nothing in the record indicates that his misinterpretation was the Department's fault.[7]

---

[7] We note that the referral letter, which was submitted as an exhibit and neither admitted nor rejected below, expressly asked Dr. Tobey to determine whether G.E.R. suffered "from a psychiatric or psychological diagnosis . . . or a mental deficiency/retardation per the DSM."

G.E.R.'s claim that social worker Allen misinterpreted Dr. Tobey's report is also unsupported. He argues that

> Allen's testimony shows she believed Dr. Tobey had considered and rejected mental health issues as a possibility, whereas *Dr. Tobey's testimony* shows he delayed evaluating G.E.R.['s] mental health condition altogether. This shows a failure on the part of the Department social worker to communicate to the service provider the purpose, scope and requirements of the psychological evaluation.

But as noted above, nothing in the record shows that the Department's referral failed to adequately define the scope of the requested psychological evaluation. Nor does Dr. Tobey's *testimony* demonstrate that Allen misinterpreted his report. Allen only had knowledge of Dr. Tobey's report, not his testimony, during the dependency and the report made no mention of mental health issues. In fact, the "Mental Status Exam" section of the report indicated that G.E.R. had no cognitive deficits.

Finally, even assuming the Department should have interpreted the report as requiring some additional action regarding G.E.R.'s mental health, the record indicates that any action would have been futile. G.E.R. failed to schedule the evaluation until late in the dependency. Considering G.E.R.'s poor participation in other critical services, his lack of interest in visiting R.R.G., and the imminent termination hearing, the provision of additional mental health services following Dr. Tobey's report would not have remedied G.E.R.'s parental deficiencies within the foreseeable future.

No. 77650-9-I/23

Affirmed.

We concur:

_____Leach, J._____

_____Dwyer, J._____

_____Appelwick, C.J.____